**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00292-CMA-GPG

JENNIFER TURNER, individually and on
behalf of others similarly situated,

      Plaintiff,

v.

EFINANCIAL, LLC, a Washington Limited
Liability Company,

      Defendant.

---

**EFINANCIAL'S MOTION TO COMPEL ARBITRATION**

---

This Court should grant Efinancial's Motion to Compel Arbitration and dismiss or stay this litigation. Plaintiff Jennifer Turner ("Turner") brings claims under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, against Efinancial, LLC ("Efinancial") based on text messages she received in response to her own request for insurance information through a website operated by All Web Leads ("AWL"). These claims are without merit because Turner expressly authorized Efinancial to contact her using an autodialer "with insurance quotes, for marketing purposes, or to obtain additional information for such purposes." *See* Decl. of Jessica Leirer in Supp. of Mot. to Compel Arbitration ("Leirer Decl.") ¶ 2.

But even if Turner's claims were meritorious, they cannot be resolved in federal court because Turner agreed to arbitrate "any and all disputes or claims that have arisen or may arise . . . out of . . . [her] use of or access to [AWL's Website]"—*including* all disputes involving the "interpretation, applicability, enforceability or formation of" the arbitration agreement itself.

*Id.* Exs. C, D. In other words, because Turner agreed to arbitrate "gateway issues" of arbitrability, the very existence of a dispute as to whether this case should be arbitrated means the case must be referred to arbitration. Indeed, there is presently pending an arbitration filed by AWL to resolve the same claims Turner makes here, *id.* ¶ 7, Ex. E, and AWL has filed a motion to intervene to protect its rights and, ultimately, compel arbitration, *id.* ¶ 8; *see also* Motion to Intervene, ECF No. 27.

Moreover, although the issue is for the arbitrator to decide, the result would be the same even if this Court had the authority to decide arbitrability. Plaintiff's underlying TCPA claims "arise out of" her request for insurance information through AWL's website because Efinancial sent texts to Turner *as a result* of her request on that website. They also "relate to" her online request because, at that time, Turner expressly consented to receive text messages from Efinancial and now claims she did not do so. Finally, as explained further below, Turner entered a binding agreement to arbitrate by clicking a button agreeing to AWL's terms, and Efinancial is entitled to enforce the agreement that Turner entered into based on its relationship with AWL.

Efinancial therefore respectfully asks the Court to issue an order compelling arbitration and to dismiss this case or, in the alternative, to stay this case pending arbitration.[1]

## I. DUTY TO MEET AND CONFER

Pursuant to D.C.Colo.LCivR 7.1, Efinancial has conferred with Plaintiff's counsel and made a good faith effort to resolve the present arbitration dispute. Plaintiff's counsel indicated that Turner would oppose any attempt to compel arbitration. *See* Decl. of James Snell in Supp. of Mot. to Compel Arbitration ("Snell Decl.") ¶ 3.

---

[1] Outright dismissal is more appropriate than staying a case pending arbitration when, as here, "all claims are arbitrable and the movant specifically requests dismissal rather than a stay." *Am. Fam. Mut. Ins. Co. v. Tamko Bldg. Prods., Inc.*, 178 F. Supp. 3d 1121, 1129 (D. Colo. 2016).

## II.     BACKGROUND.

On August 14, 2017, Turner visited www.insurancequotes.com (the "Website") in order to obtain insurance quote information. She completed an online form, provided her telephone number, and clicked a button entitled "Get My Quotes." *See* Leirer Decl. ¶ 2. The following disclosure appeared prominently adjacent to that button:

> By clicking "Get My Quotes" I provide my signature, expressly authorizing up to eight insurance companies or their agents or partner companies to contact me at the number and address provided with insurance quotes, for marketing purposes, or to obtain additional information for such purposes using an automated telephone dialing system and/or an artificial prerecorded voice, text messages or email. I understand that my signature is not a condition of purchasing any property, goods or services and that I may revoke my consent at any time. I understand that the insurance companies or their agents or partner companies may confirm my information through the use of a consumer report. I agree to this website's Privacy Policy, and acknowledge that as a member I will receive insurance quote reminders and special promotions sent to me via e-mail. I acknowledge that I have read and understand this website's Terms and Conditions, and I agree to be bound by them.

*Id.* Ex. A. The "Terms and Conditions" hyperlink led to a webpage containing the terms that Turner "acknowledge[d] that [she] ha[d] read," and to which she agreed by clicking "Get My Quotes." Among other things, the terms and conditions specified that all disputes arising from or relating to Turner's use of the Website would be subject to arbitration, providing in relevant part:

> **B. Agreement to Arbitrate**
>
> You and we each agree that any and all disputes or claims that have arisen or may arise between you and us *relating in any way* to or arising out of this or previous versions of this Agreement, *your use of or access to our Services*, or any products or services sold, offered, or purchased through our Services shall be resolved exclusively through final and binding arbitration, rather than in court, except that you may assert claims in small claims court, if your claims qualify. The Federal Arbitration Act governs the

interpretation and enforcement of this Agreement to Arbitrate section (this "Agreement to Arbitrate").

2. Arbitration Procedures

[. . .]

*The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability* or formation of this Agreement to Arbitrate, any part of it, or of this Agreement including, but not limited to, any claim that all or any part of the Agreement to Arbitrate or this Agreement is void or voidable.

The arbitration will be conducted by the American Arbitration Association ("AAA") under its rules and procedures, including the AAA's Supplementary Procedures for Consumer-Related Disputes (as applicable), as modified by this Agreement to Arbitrate.

*Id*. Ex. C (emphasis added), Ex. D (emphasis added).

Shortly after Turner clicked "Get My Quotes," AWL sent her contact information to Efinancial—one of the eight insurance companies specifically listed in the first hyperlink—so it could provide Turner with the insurance information she had requested. *See* Decl. of Jessica Leirer in Supp. of Mot. Extend SJ Deadline ("Leirer Extension Decl."), ECF No. 30 ¶ 11.

AWL provided Turner's contact information to Efinancial pursuant to an agreement, *see id*. ¶ 11, in which AWL agreed to provide Efinancial with information "collected from individuals who have provided prior express written consent as required by law or regulation . . . including, but not limited to [the TCPA]," Decl. of Michael Gooding in Supp. of Mot. to Compel Arbitration ("Gooding Decl.") ¶¶ 1-3. AWL also promised Efinancial that it would "indemnify, defend, and hold harmless [Efinancial] . . . from and against any and all third-party actions, claims, liabilities, [etc.] . . . arising out of or related to any breach of the [leads generation contract] by [AWL]." *Id*. ¶ 4.

4

Despite the arbitration provision with AWL, Turner sued Efinancial in this Court, opposed AWL's efforts to intervene in this matter, and signaled that she intends to oppose the arbitration AWL has already filed to address these issues. *See* Snell Decl. ¶ 3.

### III. ARGUMENT

The United States Supreme Court has "long recognized and enforced a 'liberal federal policy favoring arbitration agreements.'" *Nat'l Am. Ins. Co. v. SCOR Reinsurance Co.*, 362 F.3d 1288, 1290 (10th Cir. 2004) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002), and *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)). Consistent with this policy, to secure an order compelling arbitration in this case, Efinancial need only demonstrate the existence of "a valid agreement to arbitrate[] and [that] the dispute falls within the scope of that agreement." *See, e.g.*, *Tamko Bldg.*, 178 F. Supp. 3d at 1124.

Here, the parties' dispute regarding arbitrability falls within the scope of the agreement to arbitrate (as does the underlying dispute). This Court is thus obligated to compel arbitration and dismiss (or, alternatively, stay) the case because the issue of arbitrability is for the arbitrator to decide.

Nevertheless, the result is the same even if this Court were authorized to decide the issue of arbitrability for itself because (1) Turner entered into a binding arbitration agreement regardless of whether she actually read the Website terms and conditions, *see Weller v. HSBC Mortg. Servs., Inc.*, 971 F. Supp. 2d 1072, 1080 (D. Colo. 2013) (compelling arbitration and noting that "[a] party 'generally cannot avoid contractual obligations by claiming that he or she did not read the agreement.'" (citation omitted)); (2) that agreement governs Turner's TCPA claim by its plain terms; and (3) Turner is equitably estopped here from avoiding arbitration.

A. **Because Turner agreed to arbitrate gateway issues of arbitrability, the very existence of a dispute regarding arbitrability means this Court should compel arbitration.**

Before determining whether a particular dispute falls within the scope of an arbitration provision, the Court must answer the threshold question of who makes that determination: the Court or an arbitrator. *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1281 (10th Cir. 2017) ("the question of *who* should decide arbitrability precedes the question of *whether* a dispute is arbitrable" (emphasis in original)). "Because arbitration is simply a matter of contract, just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question who has the primary power to decide arbitrability turns upon what the parties agreed about *that* matter." *Id.* at 1280 (internal quotation marks, citation, and alteration omitted) (emphasis in original); *see also Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 69 (2010) ("An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."); *Getzelman v. Trustwave Holdings, Inc.*, No. 13-cv-02987-CMA-KMT, 2014 WL 3809736, at *2 (D. Colo. Aug. 1, 2014) (same).

The strong federal policy favoring arbitration "requires a liberal reading of . . . arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 23 n. 27 (1983), so that any doubts concerning the scope of arbitration agreements should be resolved in favor of arbitration, *see Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1514 (10th Cir. 1995). District courts must therefore defer to arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83 (1960); *see also Fuller v. Pep Boys–Manny, Moe & Jack of Del., Inc.*, 88 F. Supp. 2d 1158 (D. Colo. 2000) (same).

6
140653638.5

A. **Because Turner agreed to arbitrate gateway issues of arbitrability, the very existence of a dispute regarding arbitrability means this Court should compel arbitration.**

Before determining whether a particular dispute falls within the scope of an arbitration provision, the Court must answer the threshold question of who makes that determination: the Court or an arbitrator. *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1281 (10th Cir. 2017) ("the question of *who* should decide arbitrability precedes the question of *whether* a dispute is arbitrable" (emphasis in original)). "Because arbitration is simply a matter of contract, just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question who has the primary power to decide arbitrability turns upon what the parties agreed about *that* matter." *Id.* at 1280 (internal quotation marks, citation, and alteration omitted) (emphasis in original); *see also Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 69 (2010) ("An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."); *Getzelman v. Trustwave Holdings, Inc.*, No. 13-cv-02987-CMA-KMT, 2014 WL 3809736, at *2 (D. Colo. Aug. 1, 2014) (same).

The strong federal policy favoring arbitration "requires a liberal reading of . . . arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 23 n. 27 (1983), so that any doubts concerning the scope of arbitration agreements should be resolved in favor of arbitration, *see Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1514 (10th Cir. 1995). District courts must therefore defer to arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83 (1960); *see also Fuller v. Pep Boys–Manny, Moe & Jack of Del., Inc.*, 88 F. Supp. 2d 1158 (D. Colo. 2000) (same).

In this case, the agreement clearly and unmistakably provides that "[t]he arbitrator, and not any federal, state, or local court or agency" has the "exclusive authority" to rule on matters such as the "interpretation, applicability, enforceability, or formation" of the agreement, as well as whether the agreement "is void or voidable." *See* Leirer Decl. Ex. D. In other words, it provides that the arbitrator, and not the Court, must decide gateway issues of arbitrability. For this reason, the very fact that Turner and Efinancial presently dispute whether this case is subject to arbitration means that this Court should compel arbitration.

Courts have routinely compelled arbitration relying on similar language even where that language was incorporated indirectly. For example, in *Belnap*, the Tenth Circuit determined that the parties had agreed to arbitrate gateway issues because they had incorporated the JAMS Streamlined Arbitration Rules & Procedures, which, in turn, provided that:

> Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, *shall be submitted and ruled on by the Arbitrator*. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

844 F.3d at 1281 (emphasis in original). Similarly, in *Getzelman*, the court compelled arbitration because the parties had agreed to abide by AAA arbitration rules, which, in turn provided that, "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement." 2014 WL 3809736, at *3; *see also, e.g.*, *Pikes Peak Nephrology Assocs., P.C. v. Total Renal Care, Inc.*, No. 09-cv-00928-CMA-MEH, 2010 WL 1348326, at *7 (D. Colo. Mar. 30, 2010) (determining that, because the parties contracted to be bound by AAA rules, they "acquiesced to the arbitrator's jurisdiction on matters of arbitrability or scope").

In this case, not only does the arbitration agreement expressly provide that issues of "interpretation, applicability, [and] enforceability" are for the arbitrator, like the agreements at

7

issue in *Getzelman* and *Pikes Peak Nephrology Associates*, it also provides that "arbitration will be conducted by the American Arbitration Association ("AAA") under its rules and procedures," which, in relevant part, provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to . . . the arbitrability of any claim." *See* Leirer Decl. Exs. D, F at R-14(a). Therefore, as recognized in *Belnap*, *Getzelman* and *Pikes Peak Nephrology Associates*, this Court should enforce the terms of the Website agreement and compel Turner to arbitrate the present dispute concerning arbitrability of her TCPA claim.

> **B.   Even if this Court were authorized to determine arbitrability of the underlying dispute, the result would be the same, and arbitration should be compelled.**

Even if this Court were authorized to decide the arbitrability of the underlying TCPA dispute for itself, the result would be the same due to the scope of the arbitration clause at issue.

Whether an agreement to arbitrate governs a dispute "is simply a matter of contract between the parties." *Walker v. BuildDirect.com Techs., Inc.*, 733 F.3d 1001, 1004 (10th Cir. 2013) (internal quotation marks and citation omitted). As such, the Court should "apply ordinary state-law principles that govern the formation of contracts to determine whether a party has agreed to arbitrate a dispute." *Id.* (internal quotation marks and citation omitted); *see also Grosvenor v. Qwest Corp.*, 854 F. Supp. 2d 1021, 1024-25 (D. Colo. 2012) (applying Colorado contract principles to contract based on internet activity). However, as noted above, due to a strong federal policy favoring arbitration, "[a]ll doubts are to be resolved in favor of arbitrability." *Coors Brewing Co.*, 51 F.3d at 1514 (internal quotation marks and citation omitted).

This case is arbitrable because (1) Turner entered into a binding arbitration agreement; (2) that agreement governs her TCPA claim by its plain terms; and (3) Turner is equitably estopped from avoiding arbitration by attempting to plead around AWL.

8

### 1. Turner entered into a valid contract, which included an arbitration provision, when she clicked "Get My Quotes."

The first issue the arbitrator will face if this case is referred to arbitration—and the first issue the Court would face if this issue were not contractually required to be determined by the arbitrator—is whether Turner entered into a binding agreement with AWL when she clicked "Get My Quotes." The answer is yes.

Courts have divided Internet agreements into two main categories: clickwrap agreements and browsewrap agreements. Clickwrap agreements present the user with terms and conditions followed by some kind of affirmative assent mechanism—like an "I agree" button. By contrast, browsewrap agreements require no affirmative "click" by the user—assent to website terms and conditions is instead conveyed by mere use of the website. *Vernon v. Qwest Commc'ns Int'l, Inc.* ("*Vernon II*"), 925 F. Supp. 2d 1185, 1149 (D. Colo. 2013). Some courts also delineate a third category of "hybrid agreements," where "the terms being accepted do not appear on the same screen as the accept button, but are available with the use of hyperlink." *Vernon v. Qwest Commc'ns Int'l, Inc.* ("*Vernon I*"), 857 F. Supp. 2d 1135, 1149 (D. Colo. 2012).

For all Internet agreements, the key issue is whether the user had "reasonable notice, either actual or constructive, of the terms of the putative agreement and . . . manifest[ed] assent to those terms." *Id.* Clickwrap agreements and hybrid agreements are "routinely" enforced because it is easy to prove reasonable notice by pointing to the affirmative assent mechanism. *See Hancock v. Am. Tel. & Tel. Co., Inc.*, 701 F.3d 1248, 1256 (10th Cir. 2012).

Here, Turner affirmatively submitted an online insurance request through AWL's Website. *See* Leirer Decl. ¶ 2; Snell Decl. ¶¶ 4-8 (stating that Turner failed to timely respond to Efinancial's requests for admissions); Fed. R. Civ. P. 36(a)(3) (stating that "[a] matter is admitted" if a response is not given within thirty days); Snell Decl. Ex. B (responding untimely that Turner "lacks knowledge to admit or deny" whether she submitted an online insurance request through AWL's Website). Turner was required to affirmatively assent to the Website

9

terms and conditions. *See* Leirer Decl. ¶ 2. She had no reason to believe that her requests would be free from terms and conditions, nor has she claimed lack of actual notice. This case is therefore comparable to *Vernon I* because "evidence of [Turner's actual notice and] assent may be gleaned from the totality of the circumstances." 857 F. Supp. 2d at 1150.

Alternatively, it is indisputable that Turner had at least constructive notice because she entered into a clickwrap (or hybrid) agreement which stated that "[b]y clicking 'Get My Quotes'" she affirmed that she had she had "read and underst[ood]" the Website "Terms and Conditions"—which were made readily available through an underlined hyperlink. Once again, Turner cannot credibly plead ignorance in light of her affirmative request and exposure to the clear and conspicuous hyperlink notifying her of website terms and conditions. *Cf. Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 79 (2d Cir. 2017) (enforcing arbitration provision where it was made accessible via an underlined link appearing "directly below the buttons for registration"); *Vernon I*, 857 F. Supp. 2d at 1152 (noting that hyperlinks are a "user friendly" option for terms and conditions); *Grosvenor*, 854 F. Supp. 2d at 1029 (finding notice because "the user [could] review the license terms by following the tendered link"); *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 839 (S.D.N.Y. 2012) (concluding that hyperlinks "prompt[]" website users "to examine terms of sale that are located somewhere else").

Because Turner had actual and/or constructive notice of the Website terms and conditions, and because she manifested assent to those terms and conditions when she submitted her insurance request, she is bound by the arbitration provision.

**2. The Website arbitration provision governs Turner's TCPA claim by its plain terms.**

The second issue that the arbitrator will face is whether the arbitration provision governs Turner's TCPA claims. This question must also be answered in the affirmative.

10

As discussed above, the arbitration provision on AWL's website applies to "any and all disputes or claims that have arisen or may arise between you and us relating in any way to or arising out of . . . your use of or access to our Services." Leirer Decl. Ex. C. Efinancial only contacted Turner *because* she requested insurance quote services through AWL's website. Turner's use of AWL's website was thus the but-for cause of her receipt of text messages from Efinancial—in which case her present TCPA claims "arise from" her use of AWL's website.

Similarly, the parties' dispute regarding whether Turner consented to receive the text messages at issue "relates to" her use of AWL's website. AWL and Efinancial contend that the consent-mechanism was effective; while Turner argues that it was somehow ineffective or inapplicable. But the very fact that this dispute relates to use of AWL's website triggers the arbitration clause.

That the arbitration provision applies to disputes "between you and us" without specifically naming Efinancial does not change its application here. First, AWL has filed an arbitration demand and is seeking to intervene here given that Turner's claims arise from her use of AWL's website. *See* Leirer Decl. ¶¶ 7-8; *see also* Motion to Intervene, ECF No. 27. Second, Turner's dispute with Efinancial necessarily *includes* a dispute with AWL. Once again, although Turner claims that AWL's consent mechanism was not sufficient, AWL has represented to Efinancial—via contract—that Turner *did* consent to receive the texts at issue. *See* Gooding Decl. ¶ 3. There is therefore a dispute between Turner ("you") and AWL ("us") on the consent issue irrespective of whether AWL is a party to this lawsuit. The Website arbitration provision thus applies by its plain terms.

        **3.**      **Turner is bound to arbitrate her TCPA dispute with Efinancial even though Efinancial is not a party to the arbitration agreement under the doctrine of estoppel.**

Turner is estopped from avoiding arbitration here by claiming that Efinancial cannot enforce AWL's arbitration provision.

11

As an initial matter, to the extent that Turner resists arbitration on the ground that Efinancial is not a party to the arbitration agreement, this objection is rendered indefensible in light of the fact that AWL *is* a party to the arbitration agreement and *is* presently enforcing its rights by (1) filing an arbitration demand against Turner to resolve the claims she is making here and (2) seeking to intervene to protect its rights in this lawsuit. *See* Leirer Decl. ¶ 7; *see also* Motion to Intervene, ECF No. 27. Even if Turner (incorrectly) disputes Efinancial's right to enforce the arbitration agreement, she cannot credibly dispute AWL's right to do so.

But even if AWL were not actively seeking to enforce the arbitration provision, Efinancial is also authorized to enforce the arbitration provision on its own behalf because Turner "alleges interconnected misconduct between [AWL] and [Efinancial] and [because Efinancial's alleged] misconduct is intertwined with duties or obligations arising from" the contract containing the arbitration term. *Santich v. VCG Holding Corp.*, No. 17-CV-00631-RM-MEH, 2017 WL 4251944, at *2 (D. Colo. Sept. 26, 2017) (allowing two defendants who did not sign the arbitration agreements to nevertheless compel arbitration because the plaintiffs' claims were intertwined with the duties and obligations arising under that agreement); *see also Mantooth v. Bavaria Inn Rest., Inc.*, No. 17-cv-1150-WJM-MEH, 2018 WL 2241130, at *9 (D. Colo. May 16, 2018) (allowing same based on same rationale); *Meister v. Stout*, 353 P.3d 916, 921 (Colo. App. 2015) ("Equitable estoppel is . . . available [when a plaintiff subject to an arbitration agreement alleges] misconduct that is intertwined with duties or obligations arising from the underlying contract [containing the arbitration agreement].").

Here, Turner alleges that Efinancial sent her text messages in violation of the TCPA. But Efinancial only contacted Turner because she submitted a request for insurance information through AWL's website. And when Turner submitted her request, she consented to receive texts from "up to eight insurance companies," including Efinancial, and simultaneously agreed to arbitrate all disputes "arising from" or "related to" her use of AWL's Website. *See* Leirer Decl.

Exs. A-D. Whether Efinancial can be liable here therefore depends on whether Turner gave valid consent through AWL's Website (which she did).[2] Turner is therefore equitably estopped from escaping her arbitration agreement by pleading around AWL and only suing Efinancial. *Cf. Pollard v. ETS PC, Inc.*, 186 F. Supp. 3d 1166, 1175 (D. Colo. 2016) (holding that plaintiffs were estopped from avoiding arbitration where the decisionmaker would need to examine labor agreements containing arbitration terms to determine whether the employer violated the Fair Labor Standards Act).

## IV.     CONCLUSION.

Because the arbitration provision at issue provides that gateway issues of arbitrability will be decided by the arbitrator, the very fact that the parties presently dispute arbitrability means that arbitration is proper. And although the issue is for the arbitrator to decide, the result would be the same even if this Court had the authority to decide the issue of arbitrability because (1) Turner entered into a binding arbitration agreement; (2) that agreement governs her TCPA claim by its plain terms; and (3) Turner is equitably estopped from avoiding arbitration by attempting to plead around AWL. Efinancial therefore respectfully asks the Court to issue an order compelling arbitration and to dismiss this case or, in the alternative, to stay this case pending arbitration.

---

[2] That Turner does not herself rely on her agreement with AWL is immaterial. As Judge Hegarty explained in *Santich*, a defendant can compel arbitration based on interconnected misconduct even where the plaintiff has not relied on the agreement containing the arbitration term. 2017 WL 4251944, at *11 n.10.

| | |
|---|---|
| Dated: July 24, 2018 | Respectfully submitted, |
| | **PERKINS COIE LLP** |
| | By: /s/ *James Snell* |
| | James Snell |
| | 3150 Porter Drive |
| | Palo Alto, CA  94304-1212 |
| | Telephone:  650.838.4300 |
| | Email: JSnell@perkinscoie.com |
| | Facsimile:  650.838.4350 |
| | *Attorneys for Defendant* |
| | *Efinancial, LLC* |

## **CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing on the following parties via the Court's CM/ECF electronic filing system on this 24th day of July, 2018:

Michael Aschenbrener
KAMBERLAW LLC
201 Milwaukee Street, Suite 200
Denver, CO 80206
Telephone: (212) 920-3072
Email: masch@kamberlaw.com

Craig Stewart
Kevin C. McAdam
HOLLAND & HART LLP
555 17th Street, Suite 3200
Denver, CO 80202
Telephone: (303) 295-8478
Facsimile: (303) 713-6307
Email: cstewart@hollandhart.com
Email: kcmcadam@hollandhart.com

                                                s/James G. Snell, #173070
                                                JSnell@perkinscoie.com
                                                **Perkins Coie LLP**
                                                3150 Porter Drive
                                                Palo Alto, CA 94304-1212
                                                Telephone: 650.838.4300
                                                Facsimile: 650.838.4350

                                                *Attorneys for Defendant Efinancial, LLC*

15

140653638.5